## AUTHORIZATION AND SALE OF WATER WORKS BONDS.

[Circuit Court of Licking County.]

CHARLES VADAKIN, ON BEHALF OF THE CITY OF NEWARK, OHIO,
v. ANDREW J. CRILLY ET AL.*

Decided, March, 1905.

*Municipal Corporations—Water Works Bonds—Advertisement of and Offer of at Public Sale—Bids Withdrawn Because of Injunction Suit—Bonds then Sold at Private Sale—Tax-Payer Acting in Interest of Water Company—Without Standing in Court—Section 97, Municipal Code.*

1. A tax-payer suing under favor of Section 1778, Revised Statutes, to enjoin the corporate officers from selling municipal bonds, whose sole purpose in bringing the suit is to favor a water company as against the municipality, and prevent the municipality from building its own water works, such tax-payer having been by agreement with said water company indemnified from the payment of costs and expenses of such suit if it should fail, has no standing in court and said suit should be dismissed.

2. Municipal officers charged with the duty of selling municipal bonds for the building of water works, advertise the sale of said bonds according to law. At the time fixed for the sale they receive bids for the same pursuant to the advertisement. Said officers are willing and ready to sell said bonds pursuant to the offer to sell the same. After bids are received and before an award of sale is made, an injunction, procured by the city solicitor, is served upon said officers, enjoining them from selling said bonds upon that day. Thereupon all bids are withdrawn by the persons offering them. The next day an entry is put upon the journal of the court by agreement of the city solicitor and the attorney for the defendants in said injunction suit, without the intervention of the court, sustaining a demurrer to the petition therein and entering judgment upon said demurrer. Thereupon, the officers charged with the sale of said bonds sold the same at private sale for a fair price, without collusion, and in good faith on their part, and as they thought in the interest of the municipality.

*Held:* Said bonds had been once offered according to law and "remained unsold" within the provisions of Section 97, Municipal Code, and such private sale is legal, and should be sustained. ·

*Affirming 3 N. P.—N. S., 609; affirmed by the Supreme Court, without report, 73 O. S., —.

DONAHUE, J. (orally); McCARTY, J., and VOORHEES, J., concur.

Heard on appeal.

The city council of Newark, Ohio, provided for the issue of $300,000 of what were denominated water works bonds. This was done in pursuance of a vote of the electors of the city authorizing that to be done; an ordinance was then passed directing the finance committee, mayor and auditor to proceed with the sale of the bonds.

The bonds were advertised according to law and, at the time that these officers were to act on the bids received for the purchase of the bonds, an injunction was served upon them, restraining them from proceeding with the sale upon that day. Thereupon the bids were withdrawn by all bidders, and a motion was made and carried by the finance committee that all the bids be rejected. That was done after the bids were withdrawn by the bidders, and there were really no bids then before that committee.

A few days after that, negotiations were had by these officers with certain bond-bidders, and a sale of the bonds were negotiated at private sale; the bonds were delivered and the money paid. The money is still in the hands of the treasurer of this city, and the bonds are still in the hands of the first purchasers. This suit is brought by Vadakin, as a tax-payer, in behalf of the city of Newark, Ohio, for the purpose of declaring that sale a nullity, requiring the bonds to be delivered up and canceled, and requiring the city officials to return the money received from the purchasers for these bonds, and not appropriate it to any other purpose.

The first question in this case is as to the good faith of the plaintiff in bringing this action, and upon this question the court is not a unit. A majority of the court, however, think that that is one of the important questions in this case; and if he is not bringing this suit as a tax-payer, in the interest of the city and the tax-payers of the city, but is bringing it solely for the purpose of furthering private ends, and the ambitions and schemes of other men who are not in court themselves, and bringing it with the express provision and understanding that

he shall not be burdened with costs or expenses, attorney fees or the legitimate costs incurred in court, we think that is very important to be determined, and if determined against the plaintiff, is conclusive in this case.

The authorities in Ohio upon this question at this time are divided. We do not think the Supreme Court has spoken with any certainty upon the question; and while it is insisted that in the Elyria case, in the 57th Ohio State, page 374, that question was determined, yet a careful reading of that case fails to disclose that it was called in question by counsel or the court; and there the question of maintenance could not have been in the case, because of the fact that it was the gas company itself that went into court and asserted its rights as a tax-payer, and took its chances of paying its own legitimate costs and attorney fees.

This question of maintenance is one of grave importance in a court of equity. It is against public policy that a man shall be urged into litigation with the assurance that the necessary expenses that ordinarily make men hesitate before they annoy their neighbor with litigation, should be secured to them, and we think, if a man comes into court with that sort of an arrangement, or with that agreement manifest upon the face of things, he is not in good faith; he does not come in with clean hands; he ought not to be heard in a court that he is asking to exercise extraordinary powers for his relief.

The authorities upon which the majority of this court rely to support their position are collected and carefully considered in the case of *Ampt* v. *Cincinnati*, 30 W. L. B., page 237.

In the opinion, on page 241, this language is used:

"It certainly should not be contended that, in considering such a case from the standpoint of equity and justice, a court of equity should ignore the time-honored and settled principles that constitute the warp and woof of its jurisdiction and shut its eyes to the obvious evils that would flow from permitting in a case where a fact is plainly proven and openly admitted, a party to farm out, for a money consideration, to private interests and for private benefit solely, the high privilege conferred by the statute."

And again on page 243:

"The provision of the act is, that actions may be prosecuted by a tax-payer to prevent waste or injury to the property of the corporation; hence it is apparent from the language of the statute that if such is not the object of the action no power is conferred upon the court to entertain the suit."

That doctrine is supported by the 6th Nisi Prius, 82; 8th Nisi Prius, 498; 10 C. C. Rep., 642, 645; 1 Pomeroy, 397.

On the other hand, there are authorities of equal respectability with these authorities that we cite, that hold the statutory right to bring the action being once fixed and determined, the motives of the actor are in nowise important; that if he is a tax-payer, he has a right to bring the action, without giving to any man a reason why he brings it.

That is very strong reasoning and it is supported by the 24th C. C. Rep., 215; 15th C. C. Rep., 517, and some other authorities of equal value. However, a majority of this court thinks that if the evidence shows that this action is brought in the interest of somebody else, and not in the interest of the tax-payer, that if there is a contract of maintenance here between the water works company and the plaintiff, that the plaintiff ought not to be granted any relief in this case, but if any of the citizens or tax-payers are aggrieved by what has been done, there are many of them who can come in in the interests of the city and bring it to the attention of the court in a proper case.

Upon the evidence submitted we find there was a contract between the Newark Water Company and the plaintiff, Vadakin, to bring and maintain this suit, and the same to be free of all costs and expenses to him; that the suit is brought wholly in the interest of the water company now supplying the city of Newark with water; that it is brought by the plaintiff for the purpose of delaying and preventing the city from building its own water works and assisting the water company to sell its plant to the city or continuing its contract with the city to supply water to the city and its inhabitants.

Mr. Vadakin, by entering into this arrangement, which we think is apparent from the evidence, destroys his standing in

court, and in the opinion of the majority of the court ought not further to be heard, but in courtesy to our associates, and believing that this case ought to receive some further investiga: tion, we have gone beyond that to consider the conduct of the officials and their rights to sell these bonds.

The sections authorizing the sale of bonds read as follows:

"Whenever any municipal corporation issues its bonds, it shall first offer them at par and accrued interest to the trustees or commissioners, in their official capacity, of the sinking fund."

That was done in this case.

The next provision is that all bonds shall be sold at not less than par and accrued interest. That was also complied with.

The next provision is that—

"All sales of bonds, other than to the sinking fund, by any municipal corporation, shall be to the highest and best bidder, after thirty days' notice in at least two leading newspapers of opposite politics and of general circulation in the county where such municipal corporation is situated, setting forth the nature, amount, rate of interest and length of time the bonds have to run, with time and place of sale." * * *

"Provided, however, when any such bonds have been once so advertised and offered for public sale, and the same, or any part thereof, remain unsold, then said bonds, or as many as remain unsold, may be sold at private sale at not less than their par value, under the direction of the mayor and the officers and agents of the corporation by whom said bonds have been, or shall be prepared, advertised and offered at public sale."

We think that is conclusive of the right of these officers to sell the bonds, provided the advertisement and offer were sufficient. All other conditions precedent having been complied with, the officers who did sell these bonds were authorized to sell them, by Section 97 of the Municipal Code. But if that is not sufficient, Section 123 certainly is. A part of said last section is as follows:

"All contracts requiring the authority of council for their execution shall be entered into and conducted to performance by the board or officers having charge of the matter to which they relate, and after authority to make such contracts has been given and the necessary appropriation made, council shall take no further action thereon."

The council had nothing further to do with a sale of these bonds after directing these officers to make the sale.

It is claimed that there was a change in the ordinance as published; and there is some evidence to support the claim of the plaintiff in that behalf, but we think it absolutely unnecessary to make any finding as to that, because the ordinance as published must obtain, and what we find there is the authority upon which we base our conclusions in this case. If that ordinance as published is sufficient, well and good. If not, the words that were left out of the publication can not aid or add to the authority of these officers.

The question of vital importance in this case is as to the right to sell at private sale. It is undoubtedly the law of Ohio that municipal bonds may be sold at private sale after offering them by advertisement to competitive bidders. The purpose, as stated by the Supreme Court of Ohio, is two-fold: One, to give publicity to the act of the officials, of what is going on in the affairs of the city; the second is, to provide for competitive bidding, in order that the highest and best bid may be had. And these being the objects, they are the guides to courts in determining whether in fact those things have been done. Upon first glance, it would seem that all that is provided for—the advertising and offering to sell at competitive bidding—had been aborted and had not accomplished the purpose of the statute and had brought no good results to the tax-payers; that it had invited competitive bidding, and at the same time had destroyed the effect of that by withdrawing the bids. But let us see. The section reads that the bonds may be sold at private sale if any part or all of them remain unsold after advertising and offering to sell at competitive bidding. Advertisement was made; competitive bids were duly received, but, owing to the service of the injunction, which, in fact, is directly traceable to Mr. Vadakin himself, the people whose bids had been filed in good faith, with a large cash deposit, were induced to withdraw their bids before the acceptance of the bids made by them.

There is no question but that, at any time before the acceptance of the bid, the person who makes a bid may withdraw it. So that the effect of it all is that, notwithstanding the adver-

tisement, there were absolutely no bids at the time the officers were called upon to award the bonds to the highest and best bidder. The people who had made those bids, for purposes satisfactory to themselves, and serving their own interests, as they had a right to do, had withdrawn their bids. The purpose of the deposit of the money is to insure that the bonds will be taken when the bid is accepted, and not that it shall remain there for weeks or months waiting the pleasure of the board having charge of the sale of the bonds. They were withdrawn as a matter of right, and that left the officers without a bid to act upon. True, their hands were tied for a time, by an injunction, but that was not important. A suspension of the act on the part of the board from the time the injunction was served until the injunction was dissolved would not affect their right to accept the bids had the bids remained. They were entitled to accept any bid that had been received, but there were none there to accept. So that the advertisement was made, there were no offers received as contemplated in the statute, no propositions were left in the hands of the board for them to accept, either at the time they were authorized under the advertisement to accept them, or later, when the injunction was dissolved and they might act without being in contempt of court.

If they had conspired to that result in any degree whatever, the whole cause would have been attributable to them, and there would have been no offer to sell at competitive bidding. But they were absolutely without fault or blame for any of the conditions that existed. If they had been culpable in the least degree, that would perhaps charge them with all the wrongs, and would show an unfairness on their part, and a desire not to sell at competitive bidding but to sell at private sale in the interest of their friends or against the interests of the city. But, up to that time, so far as this record discloses, they were absolutely without fault. They had advertised the bonds, as required by the statute; they were there ready for competitive bids; there were no bids; the bonds, in the language of the statute, "remained unsold"; and that was all that was necessary to authorize them to sell at private sale.

We realize the full force and effect of the argument of counsel that simply because the terms of the statute are fulfilled apparently to the letter, that that is not sufficient. That we must not stick in the bark. That the question is whether the purposes of the statute have been subserved. If the purposes were not subserved, it was the fault of somebody beyond the committee, and they were called upon to do the next best thing they could do, and that was, to follow the statute in such case made and provided; and they did do that.

Now, having the right to make this sale of bonds at private sale (and we so find), the fact that they proceeded with haste is not commendable in the opinion of this court, yet we can not condemn it because it was their business; they were clothed with discretion to dispose of the bonds as best they could, but with an honest discretion, and a discretion that they must exercise in good faith, and with an eye single to the interests of the people they represented; and the fact that they moved with such alacrity in the sale of the bonds is not sufficient to attribute any particular intent on their part to do wrong, yet it is a circumstance to be considered. But this fact is not sufficient to show that there was any conspiracy or intent to wrong; but, on the contrary, we find that they were acting in good faith, in their opinion in the best interests of the city.

As to the manner of procuring the dissolution of the injunction that had been obtained to restrain the sale of the bonds in the first instance at the request of Vadakin, that is a matter that does not appeal to us as being a thing that ought to have been done. We think the solicitor should have walked into court and dismissed his suit if he thought there was nothing in it. And, so far as that is concerned, we think the solicitor was at fault in bringing that suit at all, unless he believed in it. It is true that solicitors in Ohio bring a great many suits that they think probably ought not to be brought, because of the fact that if they do not bring them some one else will, and large fees therefor will be paid out of the public treasury and they feel that they ought to protect the treasury because they are paid for that sort of service, and therefore that they ought to represent the city in these suits. But that is a mistaken idea. We think

the solicitor ought to exercise discretion in that behalf, and not bring a suit for every man who demands it.

So, if there was any blame it was in bringing the original suit to enjoin the sale, unless he believed in it. If he believed in it, he ought to have brought it. Yet, that is not important at this time. The fact that the injunction was suspended by putting the entry on sustaining the demurrer and dismissing the petition, without the action of the court, does not commend itself to this court. But it does not affect the other officers. It does not affect him, so far as that is concerned, except that it was unwise and an improper thing to do. It was a mistake of judgment, no doubt, on his part; but, passing that, we come to the question whether the consideration received for the bonds was such as to show conspiracy or want of good faith on the part of the officers. From what we have before us, we think they were not sold for such an inadequate price as would raise a presumption of moral turpitude on the part of the officers, or of any conspiracy against the interests of the city, or in favor of any particular buyer. We think the committee believed at the time they sold the bonds that they were receiving a good, fair, and liberal price for them; and we are not prepared to say from the evidence that they were not receiving such price. Other investors may give more, and others may give less, but they did get a fair and liberal premium for the bonds, and such a premium as evidences to our mind that their was no moral turpitude, or corruption, or conspiracy, on their part to sell these bonds for less than they believed them to be worth in the market. Whether they made a good bargain or not is not a question that comes to this court. They may have made a poor bargain. That is not important, for if they had the power to sell, they had the power to sell at what they believed to be right, or what they thought was the best price they could obtain, provided it was not less than par value and accrued interest.

We think this covers the entire case. Upon this latter question, as to the right to sell the bonds, the court is unanimous. The court is also unanimous as to the good faith of the officers making the sale. The court is also unanimous in the opinion

350    CIRCUIT COURT REPORTS—NEW SERIES.

that the price obtained was substantially the full value of the bonds; and we are also unanimous upon the question as to who should sell these bonds after the failure to sell at public sale. We are also unanimous that the advertisement and offer at public sale was sufficient under the statute, and while perhaps it did not accomplish all that the statute intended it should do or that we might hope now it would have done, yet it did put them in that position that there was no legal reason why they should re-advertise these bonds.

Therefore the judgment of this court is that the temporary injunction allowed by the probate judge, and dissolved by the common pleas court, be dissolved at the costs of the plaintiff.

*Flory & Flory* and *Jones & Jones,* for plaintiff.

*A. A. Slasel, Phil B. Smythe, Kibler & Kibler, J. R. Fitzgibbon, Squires, Sanders & Dempsey, William C. Boyle,* for defendants.

